UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

GERALD A. WEST,                :
                              :
          Plaintiff           :    No. 1:12-CV-01004
                              :
     vs.                      :    (Judge Kane)
                              :
OFFICER SHULTZ, et al.,       :
                              :
          Defendants          :

**MEMORANDUM**

I.   **Background**

On May 29, 2012, Plaintiff Gerald A. West, an inmate incarcerated at the United States Penitentiary, Lewisburg, Pennsylvania("USP-Lewisburg"),[1] filed a complaint pursuant to 28 U.S.C. § 1331 setting forth claims under the Federal Tort Claims Act ("FTCA") and Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1977)[2] against the United

_____

1.   West is presently incarcerated at the Trumbull Correctional Institution, Leavittsburg, Ohio.

2.   28 U.S.C. § 1331 states as follows: "The district court shall have original jurisdiction of all actions arising under the Constitution, laws, or treaties of the United States."
     The FTCA provides a remedy in damages for the simple negligence of employees of the United States to protect federal inmates. United States v. Muniz, 374 U.S. 150, 150 (1963). In presenting a FTCA claim, a plaintiff must show:  (1) that a duty was owed to him by a defendant; (2) a negligent breach of said duty; and (3) that the negligent breach was the proximate cause of the plaintiff's injury/loss. Mahler v. United States, 196 F. Supp. 362, 364 (W.D. Pa. 1961), aff'd 306 F.2d 713 (3d Cir. 1962), cert. denied, 371 U.S. 923 (1962).  As a prerequisite to suit under the FTCA, a claim must first be presented to the federal agency and be denied by the agency.
     Bivens stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest
                                                    (continued...)

States and the following individuals employed at USP-Lewisburg:
B.A. Bledsoe, Warden (retired); K. Rear (Bahre), D. Young and D.
Hudson, Associate Wardens; K. Whittaker, Lieutenant; J. Adami,
Unit Manager; M. Edinger, Counselor; and C. Shultz and R. Spade,
Correctional Officers.  Doc. 1, Complaint, 1-11; Doc. 7, Waiver of
Service of Summons.

In the complaint West alleges that on August 10, 2010,
his cellmate threatened to stab him if he did not move out. Id. at
3.  West via a "cop-out" or note notified Corrections Officer
Grove of the threat and that his cellmate had a knife, but Grove
allegedly informed West that he would not be moved unless "he was
f***ing or fighting."[3] Id.  West claims he was then sexually
assaulted the same day by his cellmate. Id. at 4. On August 11,
2010, West claims that he gave a "cop-out" to Physician Assistant
Zook "notifying prison staff of the situation."[4] Id. West then
alleges that Correctional Officer Shultz "came to [his] cell and
tried to inform [his] cellmate about the cop-out" and that
"[a]fter Shultz left, [he] was assaulted by his cellmate again."

---

2.  (...continued)
could invoke the general federal question jurisdiction of the
district court to obtain an award of monetary damages against the
responsible federal official." Butz v. Economou, 438 U.S. 478,
504 (1978).

3.  Grove is not named as a defendant in this action.

4.  Zook is not named as a defendant in this action.  West does
not specifying what he reported in the "cop-out" or what Zook did
with it.

Id.   West next claims that "[a]fter four (4) hours, food trays were pass[ed] out" and, without giving any specifics, that he "told Officer Shultz that [he] was not going to give back the food tray until a Lieutenant was notified." Id.   West then avers that Lieutenant Carasquillo[5] arrived at the cell and that he was removed from his cell and escorted to a holding cell by Correctional Officer Spade. Id. at 4-5.   West contends that Lieutenant Carasquillo, Unit Manager Adami and Captain Trate[6] "threatened [him] not to say anything about this incident or he would not leave the [Special Management Unit] program. Id. at 4. West further claims that Correctional Officer Spade "told him that he did not believe the cop-out, so he through (sic) it away." Id. at 5.   West avers that he was subsequently moved to Z-Block by Unit Manager Adami and advised by Adami that "he better find a cellmate, or he would be placed in restraints." Id.   West then alleges that on March 23, 2011 (more than 7 months after the alleged threat by Adami) he "filed a complaint against Mr. Adami concerning the threat." Id.

The next section of West's complaint is entitled "Misuse of Force, Retaliation." In this section, West first avers that on March 28, 2011, he "refused to cell with a gang member that was moved into [his] cell." Id.   West then contends that Correctional

---

5.   Lieutenant Carasquillo is not named as a defendant.

6.   Captain Trate is not named as a defendant.

Officer Shade falsified a misconduct report "so that [he] would be put into hard restraint[s]" and that he "was taken to a cell with another inmate, also in restraints." Id.  West contends that when they arrived at the other cell, he "was thrown on top of [the other] inmate" who then "in return kicked [West onto] the floor." Id.  West claims that he had to sleep on the floor for two days and during this time he could not use the restroom or eat food. Id. at 6.  West avers that during this time he complained about the restraints being "too tight and that he needed medical attention." Id.  On the third day West contends that a Lieutenant advised him that if he wanted out of the restraints that he would have to find a cellmate. Id.  West claims that he agreed to find a cellmate "because he couldn't take the pain of the hard restraint being to (sic) tight, cutting off his circulation." Id.  West avers that he was moved to J block and that he then "complained to the Physician Assistant Pigus[7] about not having feeling in his hands, and he would like this injury to [be] filed in his medical record." Id.

West next alleges that about four weeks later, on May 10, 2011, he went on a hunger strike and that on May 15, 2011, he "was taken to D-Block and stripped of all of his legal property and given paper clothing." Id. at 7.  West does not allege that any of

---

7.  The correct spelling is Pigos and he is not named as a Defendant in this action. Furthermore, he is a physician and the Clinical Director at USP-Lewisburg.

4

the named Defendants were involved in this incident.  West further claims that Counselor Edinger and Correctional Officer Whittaker[8] told him that he was getting a cellmate and when he was taken to that cell (apparently in D-block) West allegedly told them that "he did not want to go into that cell, because [the] inmate said he would assault any inmate they tried to put in his cell."  Id. West claims that when they arrived at the cell, the inmate inside the cell stated "I don't want him in my cell" and that West again objected to being placed in the cell. Id.  West further asserts that Correctional Officer Whittaker responded by stating that he was "going into this cell or restraint." Id.  When the cell door was opened, West claims that the inmate kicked West in the ribs and chest. Id. at 8.  West then claims he was placed in an empty cell where he was denied mail, hygiene items and clean clothes and that Defendants Hudson, Bahre and Young told him that his property would be returned when he ended his hunger strike. Id.  West requests injunctive and compensatory relief. Id. at 9.

The complaint was served on the individual defendants on June 6, 2012, and upon the United States Attorney's Office on June 7, 2012.  Defendants sought and were granted an enlargement of time to respond to the allegations of the complaint.  On September 20, 2012, Defendants filed a motion to dismiss the complaint and for entry of summary judgment in their favor.  The primary

---

8.  West incorrectly refers to Defendant Whittaker as "Whittener."

contention of the Defendants was that West failed to exhaust his administrative remedies.  By memorandum and order dated April 24, 2014, this court granted in part Defendants' motion to dismiss and/or for summary judgment. Docs. 74 and 75.

After the court's decision granting in part the motion to dismiss and/or for summary judgment, the remaining Defendants - Correctional Officers Shultz and Shade and the United States - filed an answer on May 15, 2014, and the parties proceeded to conduct discovery, including the taking of West's deposition on January 20, 2015.  Following the close of discovery, West filed a motion for partial summary judgment in his favor and the remaining Defendants filed a motion to dismiss and/or for summary judgment. Docs. 93 and 94.  West failed to file a brief in support of his motion in accordance with the Local Rules of Court although he filed a reply to Defendants's response to that motion.  The remaining Defendants' motion to dismiss and/or for summary judgment is ripe for disposition and for the reasons set forth below the court will grant summary judgment in favor of the remaining Defendants and against West.

## II.    Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56 to go beyond the pleadings with affidavits, depositions, answers

to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Electric Industrial Co. v. Zenith Radio</u>, 475 U.S. 574, 586 (1986). When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Celotex</u>, 477 U.S. at 323. <u>See</u> <u>Harter v. G.A.F. Corp.</u>, 967 F.2d 846, 851 (3d Cir. 1992).

**III.    <u>Statement of Facts</u>**

Local Rule 56.1 states in toto as follows:

A motion for summary judgment filed pursuant to Fed.R.Civ.P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraph set forth in the statement required in the foregoing paragraph; as to which it is contended that there exists a genuine issue to be tried.

<u>Statement of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements</u>.

<u>All material facts set forth in the statement required to be served by the moving party will be deemed</u>

> to be admitted unless controverted by the statement
> required to be served by the opposing party.

M.D. Pa. LR 56.1 (emphasis added).  A standard practice order was
issued on May 29, 2012, which advised West of the requirements of
several Local Rules of Court, including Local Rule 56.1. Doc. 4.

On May 11, 2015, the Defendants filed a statement of
material facts in accordance with Local Rule 56.1 along with
evidentiary materials, including the deposition of West.  Docs.
102 and 102-1.  The Defendants' statement consisted of 85 numbered
paragraphs[9] and all of them except one referenced parts of the
record that supported the paragraphs. Id.  West on January 4,
2015, filed a document entitled "Statement of Facts" which
purports to respond to the Defendants' 85 paragraphs. Doc. 125-1.
However, in that document West conceded all of the Defendants'
paragraphs except for eleven (paragraphs 34, 40, 44, 46, 47, 60,
65, 77, 81, 83 and 84) and when denying those eleven paragraphs,
West failed to refer to parts of the record that supported his
denial.[10] Id.  Furthermore, as will be explained *infra* the record
amply supports the 11 paragraphs, including the transcript of

---

9. The last paragraph is numbered 84.  However, after paragraph
37 there is an error in numbering.  The next two paragraphs are
numbered 28 and then 38.

10. West also filed a statement of material facts in support of
his motion for partial summary judgment.  However, he failed to
support any of his stated facts by reference to specific portions
of the record. Furthermore, the statement is essentially a mere
recitation of the allegations of the complaint and refers to
claims and defendants who have already been dismissed from this
action.

West's deposition.  The first 15 paragraphs of Defendants'
statement of material facts essentially mirror the <u>allegations</u> of
West's complaint.

Starting with paragraph 16 Defendants' statement of
material facts states as follows:

> 16.  In a deposition conducted in this matter, West
> described the incidents of August 10 through 11, 2010.
> Transcript (Ex. A) at 7-27.[11]

> 17.  West stated that on August 10, 2010, "they were
> forcing me in the cell with this dude named Gray.  He's
> a GD gang member.[12] I've been telling them I didn't want
> to be there with no gang members, period." <u>Id.</u> at 7.

> 18. West stated that he spoke to an officer that night
> about getting his cellmate removed from his cell, but he
> was told that he would not be moved "if I'm not f***ing
> or fighting." <u>Id.</u>

> 19. West continued,

>> And that night we got into it and, you know,
>> he said he was going to assault me that night.
>> That morning I waited – I woke up, I wrote out
>> a kite [cop out] before he got up and gave it
>> to the – I act like I was giving a cop out for
>> the nurse.  Nurse Zook, physician, I gave it
>> to him. He snuck it. I mean, he gave it to me
>> and nodded.  He gave it to the officer up in
>> front.

>> Nobody came back.  Shultz came back and looked
>> at me and said something, and just kept
>> walking past the cell like I'm not moving you,
>> I'm not going to move you.  She didn't say
>> it, but then later – two hours later or

---

11.  Defendants refer to the trancript page number and not the
ECF page number.

12.  It was subsequently explained that "GD" is an abbreviation
for Gangster Disciples. Doc. 102-1, at 10, Transcript, p. 8.

> something, I'm still looking at her.[8] I'm
> hoping they come and get me out the cell.
> Then she come back and say something to him,
> like, oh you ain't try to got to get a move.
>
> So my cellee knew what I did.  He found out
> – well, he guessed what I did because he's
> trying to inform that, yeah, he wrote out a
> cop out.  See, what was this cop out about.
> So, you know, we got into it again, got me
> again.

Id., at 8-9.

20.   When asked what the cop out said, West stated,

> Exactly I can't remember.  I know I said this
> man threatened me.  He said if I don't get
> the f\*\*k out of the cell, he's going to f\*\*k
> me up.  I don't think I said assault in that.
> I mean, he said he's going to assault me.  He
> going to f\*\*k me up, probably like that.
> Exactly what's on the kite, I didn't know
> because they supposed to have the kite.

Id., at 13.

21.   West stated that he gave this cop out to Officer
      Zook around 6:00 am on August 11, 2010, as Officer
      Zook was making his rounds, but no one came to
      remove him from the cell that day. Id., at 13-16.

22.   He further stated that the following day, Officer
      Zook told him he had taken the cop-out "up to the
      front" (i.e., to the office), and that's how he
      knew that Officer Zook passed the cop-out on to
      someone. Id., at 14.

23.   However, West stated, "He didn't tell me who.  Like
      I don't know who, but I know Shultz was there and I
      know Spade was there.  Exactly who he gave it to,

---

8.  This appears to be the first time in the record where the
gender of Correctional Officer Shultz is revealed.

I don't know, but I know it went up there."[9] <u>Id.</u>

24.    West was asked how he knew that Officer Shultz and
    Spade were there when Officer Zook took his cop-out
    to the office, and he stated:

    A:    I don't know who was in the office at that
        time.

    Q:    Okay. Now, you just said, though, that I know
        Shade (sic) and Shultz were there.

    A:    Yeah, that – when they came back.  When I
        first - after he came, they came back. At the
        time I didn't know who gave it to them.  I
        know who came back after.  If it was another
        officer in there, they didn't come.  They
        didn't come that night, I mean, after he –
        he took it up there, they didn't come
        immediately back.  After a while, which I
        don't know how much time it was, but those
        the first two other people I seen after I gave
        him [Zook] the kite.

<u>Id.</u>, at 15-16.

25.    West stated that Defendant Shultz was the first
    officer to come down the range, before 7:00 am,
    and she didn't say anything – just looked into
    his cell. <u>Id.</u>, at 17.

26.    West stated that he was standing at the cell door
    the next time Defendant Shultz came to his cell,
    and he described their encounter as follows:

    Q:    Okay. So you're standing at the door.  Shultz
        comes down the second time, and what does she
        say to you at this time?

    A:    That's what I'm saying, exactly I don't know,
        but she tried to tell about the cop out,

---

9.  It was later revealed that there are two different officers
with similar names – Spade and Shade.  Correctional Officer Shade
is one of the remaining Defendants in this action.

what's this cop out about.  And I don't know
exactly what she said, but she was like
basically what is this cop out about.  You're
not going to get moved, something to effect
like this.  You know, this has been from
five year ago, I think.

Id., at 18.

27.  When asked what he told Officer Shultz when she
inquired about the cop out, West replied that he
couldn't say much because his cell mate was right
there, and he couldn't remember saying anything
specific.  Id., at 19-20.[10]

28.  He recalled that Officer Shultz said something to
let him know that he was not going to be moved out
of the cell and then left.  Id., at 20.

29.  West noted that Officer Shultz made rounds several
times that day, and each time she looked into the
cell and kept walking.  Id.

30.  West recalled that he did not go to recreation that
day.  Id., at 20-21.

31.  West stated that at lunch that day, when staff was
collecting lunch trays from the inmates, West
refused to give them his tray.  Id., at 21.

32.  He told staff that he would not give up his lunch
tray until he saw a lieutenant.  Id., at 22.

33.  Lt. Carasquillo and other officers then came to the
cell, and West was removed and placed in a holding
cell.  Id., at 23.

Doc. 102, ¶¶ 16-33.

---

10.  It is not clear from the record how West's testimony that
his cellmate threatened to assault him if he was not moved to
another cell can be reconciled with his representation that West
was concerned lest his cellmate learn that he had requested to be
moved.

13

The next paragraph, number 34, is denied by West and states as follows; "Approximately nine months later on April 4, 2011, West reported that he had been sexually assaulted by his cell mate on August 10 and 11, 2010, and he was interviewed by [Special Investigative Services ("SIS")] staff. SIS Report redacted (Ex. E) at 1." In denying this paragraph West merely states as follows, including the grammatical errors: "Plaintiff numerous informal complaints, which were not answered. The Plaintiff a BP-9[11] directly to the Northeast Regional Office which in turn made Prison Officials investigate my complaint." West does not set forth any evidence that contravenes the essential point of paragraph 34 which is that he waited a significant period of time to report the sexual assault. He does not indicate when and to whom he submitted the informal complaints or when he sent the BP-9 to the Regional Office. Furthermore, the record establishes that on April 4, 2011, West was interviewed by SIS staff of the Bureau of Prisons "about a reported sexual assault." Doc. 102-2, at 28 (Exhibit D). The conclusion of the report generated after the investigation states that "[b]ased on . . . the lack of any physical evidence, it is the determination of this investigator, the allegation is unfounded. Due to the length of

_____

11. A "BP-9" is the Bureau of Prisons' initial formal Administrative Request form which is filed with the Warden of the institution.

time that had passed from the alleged sexual assault date of
August 10, 2010, and reporting date of April 4, 2011, there were
no injuries to be discovered or noted.  Also, after reviewing the
Psychological evaluation, it was determined that West did not
exhibit the behavior associated with having experienced a
traumatic event." Id., at 30.

The statement of material facts continues with paragraph
35 which is confirmed by West and states as follows: "The SIS
Report notes, 'Inmate West continued to explain how he attempted
to notify staff by holding his food trays.  He claimed to have
told Captain, Mr. Adami and Lt. Carasquillo that he needed to see
medical, but notes he does not think they heard him.' Id., at 2."
Paragraph 36 notes the SIS investigator's conclusion set
forth above and paragraph 37 indicates that the SIS investigator
recommended that a Central Inmate Monitoring System assignment of
separation be placed on West and the cellmate who he alleged
sexually assaulted him and further recommended that West remain in
the Special Management Unit "and continue to receive cell mates as
appropriately determined by staff."

The statement of material facts then moves to the March
29, 2011 incident of alleged retaliation by Correctional Officer
Shade and continues with a misnumbered paragraph as follows:

28.  On March 29, 2011, an incident report was written
against West, charging him with threatening another

15

with bodily harm and refusing an order. Incident
Report (Ex. B) at 1.

38.  The reporting officer stated that when he was
     returning inmates from recreation, West "refused
     to go back in his assigned cell in 310.  Inmate
     West stated, "if you put me back in that cell I am
     going to f**k up my cellie and then I will f**k up
     any officer that comes in my cell then." Id., at 1.

39.  West was given a copy of the Incident Report that
     day. Id.

Although West confirmed paragraphs 28 and 38 and 39, he denied

paragraph 40 which states as follows: "An investigation was

conducted and West was advised of his rights. Id., at 2."  In

denying this paragraph West merely states as follows: "I was taken

to segregation and placed in retraints." West does not set forth

any evidence to contradict the essential point of paragraph 40

which is that an investigation was conducted and he was advised of

his rights.  Furthermore, the summary judgment record reveals that

an investigation was conducted by B. Tharp, Activities Lieutenant

and that he advised West of his rights.  Doc. 102-2, at 17

(Exhibit B).

    West confirmed paragraphs 41 through 43 which state as

follows:

41.  The investigating officer reported that West had
     no comment and did not request any witnesses at
     that time. Id.

42.  The investigating officer concluded that the report
     was true as written, and the matter proceeded to a
     Unit Discipline Committee ("UDC") for an initial
     hearing. Id., at 3.

16

43. At the UDC hearing, held on March 30, 2011, the Committee found that West committed the prohibited acts and referred the matter to the DHO for further hearing, recommending appropriate sanctions which were not available to the UDC. <u>Id.</u>

Although West confirmed paragraphs 41 through 43, he denied paragraph 44 which states as follows: "West received notice of a DHO hearing on March 30, 2011. <u>Id.</u>, at 4." In denying this paragraph West merely stated as follows: "The Plaintiff never received a notices." (sic) West offers no evidence contrary to the assertion in paragraph 44 that he was given notice of the DHO hearing. Furthermore, the summary judgment record reveals that on March 30, 2011, West was given notice of the hearing. Doc 102-2, at 19 (Exhibit B).

West confirmed paragraph 45 which states as follows: "He requested John Adami as his staff representative for the DHO hearing, requested Officer Murray as a witness, and requested that video cameras be reviewed." West than denied paragraphs 46 and 47 which state as follows:

46. West also received a written copy of Inmate Rights at Discipline Hearing on [March][12] 30, 2011. <u>Id.</u>, at 5.

47. John Adami was advised of his responsibilities as West's staff representative on [March][13] 30, 2011. <u>Id.</u>, at 6.

---

12. There was a typo in the Defendants' statement. It indicated August. However, the record clearly reveals it was March.

13. <u>Id.</u>

In denying these paragraphs West gave no explanation.
Furthermore, the summary judgment record reveals that West
received a copy of the Inmate Rights at Discipline Hearing and
that his representative was advised of his responsibilities. Doc.
102-2, at 20-21 (Exhbit B).

West then confirmed paragraphs 48 through 59 which state
as follows:

48. The DHO hearing was held on June 22, 2011. DHO
Report (Ex. C) at 1.

49. The DHO noted that Mr. Adami appeared as West's
staff representative and reported that West's
only request was to review video footage of the
incident, but Mr. Adami advised that there was
no such video footage available for review. Id.

50. West confirmed that he understood his rights
before the DHO and was prepared to proceed. Id.

51. West chose to make a statement at the hearing,
stating initially that the fact that there was
no video footage was a violation of his
"procedural due process rights." Id.

52. He presented no documentary evidence, but
testified that the Incident Report was fabricated
and the incident never occurred. Id., at 1-2.

53. Officer Murray appeared as West's witness and
testified that he was present at the time and
place where the incident allegedly occurred, he
witnessed the reporting officer approach the
recreation cage, and he witnessed West stating,
"[i]f you put me back in that cell, I am going
to f**k up my cellie, and then I will f**k up any
officer that comes in my cell then." Id., at 2.

54. Based on the eyewitness written account of the
reporting officer and the testimony of Officer
Murray, the DHO found that West committed the

18

prohibited acts as charged. <u>Id.</u>, at 2-3.

55. He also considered West's testimony, but found it to be less credible than that of the reporting officer and Officer Murray, to which he gave greater weight. <u>Id.</u>, at 3.

56. The DHO further considered West's disciplinary history, which includes three prior disciplinary actions for threatening bodily harm. <u>Id.</u>

57. The DHO noted that the video footage West requested was not immediately preserved, that when the discipline packet was received in the DHO Office, an attempt was made to obtain the video footage, but it had already been recycled and was no longer available for review. <u>Id.</u>

58. However, the DHO noted that since there is no audio component to the prison's surveillance videos, the only exculpatory evidence the video could have provided concerned whether the reporting officer was present at the time and place of the incident. <u>Id.</u>

59. The DHO further noted that West initially indicated Officer Murray would testify that the reporting officer was not present and that he did not commit the prohibited acts; but after Officer Murray's testimony contradicted his version of events, West claimed that Officer Murray was also not present.  <u>Id.</u>, at 4.

Although West confirmed paragraphs 48 through 59, he denied

paragraph 60 which states as follows: "In light of this evidence,

the DHO concluded that West requested the video not because he

believed it would prove he did not commit the prohibited acts, but

that if it was unavailable, he could claim violation of his due

process rights, which he did. <u>Id.</u>"  In denying this paragraph

West did not point to any evidence contravening the paragraph but merely stated that "[t]he DHO has a history of denying Inmate request (sic) for video footage." The finding of the DHO is reasonably supported by the record and in fact West's response to paragraph 60 buttresses the DHO's finding.[14]

West then confirmed paragraphs 61 through 64 which outline the offenses committed (which were Code 203, threatening

---

14. Plaintiff has failed to establish factual support for a due process violation. In Wolff v. McDonnell, 418 U.S. 539, 563-573 (1974), where the plaintiffs were deprived of good time credits as a severe sanction for serious misconduct, the Supreme Court held that such inmates have various procedural due process protections in a prison disciplinary proceeding, including the right to call witnesses and to appear before an impartial decision-maker. The Supreme Court recognized that "prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." Id. at 556. Nonetheless, the Supreme Court held that a prisoner facing serious institutional sanctions is entitled to some procedural protection before penalties can be imposed. Id. at 563-71. The Supreme Court set forth five requirements of due process in a prison disciplinary proceeding: (1) the right to appear before an impartial decision-making body; (2) twenty-four hour advance written notice of the charges; (3) an opportunity to call witnesses and present documentary evidence, provided the presentation of such does not threaten institutional safety or correctional goals; (4) assistance from an inmate representative, if the charged inmate is illiterate or if complex issues are involved; (5) a written decision by the fact finders as to the evidence relied upon and the rationale behind their disciplinary action. Id.

An additional procedural requirement was set forth in Superintendent, Massachusetts Correctional Institution at Walpole v. Hill, 472 U.S. 445, 453-456 (1985). In that case, the Court held that there must be some evidence which supports the conclusion of the disciplinary tribunal. In the present case the undisputed facts establish that all the requirements of Wolff and Hill were met with respect to disciplinary proceedings.

bodily harm and Code 307 refusing to obey an order) and the sanctions imposed on West, including loss of 27 days of Good Conduct Time and an aggregate 45 days of disciplinary segregation. West then denies paragraph 65 which states as follows: "The DHO Report, issued on October 31, 2011, was provided to West on October 24, 2011. Id., at 5."  In denying this paragraph, West did not present any evidence but merely stated as follows: "I was never issued a DHO report."  The summary judgment record supports this paragraph.  On October 21, 2011, DHO Chambers issued the report and it was delivered to West on October 24, 2011, by M. Inch. Doc. 102-2, at 26 (Exhibit C).

West then confirmed paragraphs 66 and 67 which indicate that he appealed the DHO's determination of guilt and that he did not file a court action after that appeal.

The next section of Defendants' statement of material facts deals with West's claim under the FTCA against the United States for the alleged negligence of BOP employees in failing to protect West from the attack by another inmate on May 15, 2011. West confirmed paragraphs 68 through 76 which state as follows:

> 68. During his deposition, West stated that he went on a hunger strike to get away from the inmate he was celled with at the time, because that inmate was a "chronic masturbator." Transcript (Ex. A) at 47.

> 69. West stated that he was moved to another cell, but a Lieutenant told him that he would still "get a cellie." Id.

21

70. West stated that he was placed in a cell with another inmate who was also on a hunger strike because he didn't want a cell mate. Id.

71. He stated that staff placed him in hand restraints and escorted him to that cell. Id., at 49.

72. West stated that when they were at the door of the cell, the other inmate said "he ain't coming in here." and West interpreted that statement as a threat to assault him. Id., at 49.

73. West stated that an officer held on to him while the cell door was opened, and at that point, the other inmate kicked West in the chest. Id., at 48, 50.

74. He stated that the officers then "beat [the other inmate] up and they slammed me . . . after they took him out, beat him up and put him down in restraint, then they put me in the cell." Id.

75. West noted that he had a big red spot where he was kicked in the chest. Id., at 50.

76. He clarified that they grabbed him by his hand restraints, "slung [him] down to the floor" face first, and kept him on the floor. Id.

Although West confirmed paragraphs 68 through 76, he denied paragraph 77 which states as follows: "West stated that the other inmate was removed from the cell, and West was taken to see medical staff and then was returned to the cell, where he remained without a cellmate for the length of his hunger strike." Id., at 51." In denying this paragraph West did not point to any evidence contravening the paragraph but merely stated as follows: "West was not taken to see medical."  Furthermore, the summary judgment record, specifically West's deposition testimony, reveals that he

22

was taken to see a nurse and then put back in the cell. Doc. 102-2, at 4.

West then confirmed paragraphs 78 through 80 which state as follows:

> 78.  West stated that when an inmate goes on a hunger strike, "you're not supposed to be in a cell with another person.  They did it because they wanted to prove, we're going to make you take a cell[ie]. And it says in policy, you're not supposed to have A cellee, but they did it and they already admitted it." <u>Id.</u>, at 51-52.

> 79.  West stated that on that date, May 15, 2011, staff took his clothes and his legal property, then returned the property 12 days later when he ended his hunger strike, though he was missing some of his legal property and "candy bars, you know, stuff like that. Exact thing.  I don't know." <u>Id.</u>, at 53-54.

> 80.  K. Pigos, Clinical Director of the Medical Department at USP Lewisburg, declares that BOP Program Statement 5562.05, Hunger Strikes, provides that "<u>ordinarily</u> inmates on a hunger strike will be placed in a single cell observations room so as to preclude other inmates from passing them food, water, etc., while on a hunger strike," enabling Health Services staff to properly monitor the inmates food and water consumption.  Pigos Decl. (Ex. E)¶ 2; see BOP P.s. 5562.05 (Att. 1 to Ex E) at 3.

(Emphasis added.) Although confirming the above three paragraph, West then denied paragraph 81 which states as follows: " Although inmates on hunger strikes are typically placed in a single cell, "it is not uncommon for two inmates on a hunger strike to be in a cell together.  The purpose of the single cell . . . can still be accomplished since both inmates are on hunger strikes. Pigos Decl.

23

(EX A) ¶ 3."  In denying this paragraph West did not give a reason or refer to any evidentiary materials.  The summary judgment record supports the paragraph, specifically the declaration of Clinical Director Pigos.

Paragraph 82 which is confirmed by West is a portion of BOP Policy Statement 5562.05.   West then denied paragraphs 83 and 84.  Paragraph 83 states that "[t]here is nothing in the BOP policy regarding hunger strikes which precludes placing two inmates who are on hunger strikes in a cell together."  West merely denied this paragraph without giving a reason or pointing to any evidentiary materials.  A review of the policy reveals that it does not preclude the placement of two inmates both on hunger strikes in a single cell. Finally, paragraph 84 states that "Dr. Pigos declares that the reason for celling hunger strike inmates together include the availability of cells, inmate safety (there is an increased risk of suicide for inmates celled alone) and "a multitude of other possible reasons."  In denying this paragraph West merely stated "[t]here is a increased danger for inmates in their weaken state to climb up on a top bunk."  West provided no contravening evidence and the paragraph is supported by the record, Dr. Pigos' declaration.

## IV. **Discussion**

The claims remaining in this action are: 1) West's <u>Bivens</u> claim against Correctional Officer Shultz for revealing

that West had complained that his cellmate threatened him, after which the cellmate allegedly sexually assaulted him, and Correctional Officer Shultz failed to immediately notify a lieutenant of the assault; 2) West's <u>Bivens</u> claims against Correctional Officer Shade for writing a retaliatory false misconduct report against him on March 29, 2011, and placing him in restraints; and 3) an FTCA claim against the United States for failure to protect West from another inmate attacking him on May 15, 2011.

With respect to the first claim, West essentially argues that Correctional Officer Shultz was deliberately indifferent to his safety, i.e., Correctional Officer Shultz failed to protect him from the attack by his cellmate. The second claim by West is that Correctional Officer Shade filed the alleged false misconduct report in retaliation for West refusing to accept a cellmate on March 28, 2011. The third claim is one against the United States for the negligence of individuals employed by the Federal Bureau of Prisons.

The remaining Defendants make several arguments, including the following: (1) no jury could reasonably conclude based on the summary judgment record that Correctional Officer Shultz was deliberately indifferent to West's safety; (2) the court should enter summary judgment in Correctional Officer Shade's favor because West was provided with procedural due

25

process during the allegedly retaliatory disciplinary action and there was some evidence to support the finding of guilt; and (3) the discretionary function exception to the FTCA precludes West's negligence claim against the United States and the Bureau of Prisons did not breach a duty of care when they assigned West to a cell with another inmate because they had no reasonable notice that a single kick To West would result from the inmate.  The Court will address the remaining Defendants' arguments in that order.

A person seeking to recover damages under "Bivens" must satisfy three requirements; he must: (1) assert that a constitutionally protected right has been violated; (2) state a cause of action sufficient to invoke the general federal question jurisdiction of the district court; and (3) demonstrate why money damages are the appropriate form of relief.  See Muhammad v. Carlson, 739 F.2d 122, 123-4 (3d Cir. 1984).

West's claim against Correctional Officer Shultz is based on the Cruel and Unusual Punishments Clause of the Eighth Amendment.  Claims based upon the Cruel and Unusual Punishments Clause have both objective and subjective components. Wilson v. Seiter, 501 U.S. 294, 298 (1991)  Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component. Id.  The subjective component is met if the person or persons

causing the deprivation acted with "a sufficiently culpable state of mind".  Id.

　　　　With regard to the subjective component, to establish an Eighth Amendment claim, West must show that the prison official acted with "deliberate indifference" to a substantial risk of serious harm.  Farmer v. Brennan, 511 U.S. 825, 827 (1994) (citing Helling v. McKinney, 509 U.S. 25 (1993); Wilson v. Seiter, *supra*; Estelle v. Gamble, 429 U.S. 97 (1976)).  In other words, the official must know of and disregard an excessive risk to inmate health or safety.  Natale v. Camden County Corr. Facility, 318 F.3d at 582; Farmer, 511 U.S. at 837.

　　　　In the context of a correctional officer failing to prevent assaults by other inmates, a plaintiff must prove more than that he had a fight with another inmate, see Beard v. Lockhart, 716 F.2d 544, 545 (8th Cir. 1983), and mere negligent conduct that leads to serious injury of a prisoner by a prisoner does not expose a prison official to liability. Davidson v. Cannon, 474 U.S. 344, 347-48 (1986). To succeed, a prisoner must show that: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists"; (3) the defendant actually drew this inference; and (4) the defendant deliberately disregarded the apparent risk. Farmer, 511 U.S. at 834-37.

Although West indicates that Correctional Officer Shultz came to his cell at one point and asked him what the cop-out was about, West declined to discuss it with Correctional Officer Shultz at that point.  The summary judgment record fails to reveal that Correctional Officer Shultz was privy to the content of the cop-out described by West.  The undisputed record demonstrates that West did not directly inform Correctional Officer Shultz, either verbally or in writing, that he feared for his safety, that he had been assaulted the previous night, or that his cellmate had threatened to stab him. West gave the cop-out to other staff - not Correctional Officer Shultz - and only assumes that Correctional Officer Shultz saw the contents of the cop-out because she was the first officer to make rounds past his cell on the morning of August 11, 2010, though she said nothing the first time she went past his cell.

The court discerns no evidence, direct or circumstantial, in the summary judgment record from which a jury could reasonably find that Correctional Officer Shultz had the requisite culpable state of mind, i.e., she knew of and deliberately disregarded a serious risk of harm to West. Consequently, the court will grant summary judgment in favor of Correctional Officer Shultz and against West.

A prisoner in a retaliation case must demonstrate that the conduct that led to the alleged retaliation was

constitutionally protected. <u>Rauser v. Horn</u>, 241F.3d 330, 333 (3d
Cir. 2001); <u>Thaddeus-X v. Blatter</u>, 175 F.3d 378, 389 (6th Cir.
1999)(en banc). In addition to the requirement of establishing an
underlying constitutional right, the prisoner must allege that he
or she suffered an adverse action or harm as result of the alleged
retaliation and that the exercise of the inmate's constitutional
right was a substantial motivating factor in the state actor's
decision to take the alleged retaliatory action. <u>Rauser</u>, 241 F.3d
at 333.  A prisoner satisfies the adverse action prong by alleging
facts which would be sufficient to deter a person of ordinary
firmness from exercising his constitutional right.  <u>Allah v.
Seiverling</u>, 229 F.3d 220, 225 (3d Cir. 2000).

      The filing of a false misconduct report does not violate
an inmate's due process rights.  The general rule, as stated in
<u>Freeman v. Rideout</u>, 808 F.2d 949, 951 (2d Cir. 1986), provides
that a "prison inmate has no constitutionally guaranteed immunity
from being falsely or wrongly accused of conduct which may result
in the deprivation of a protected liberty interest."  In contrast,
filing a false misconduct report is cognizable as a denial of due
process when the false misconduct charge is filed "for the sole
purpose of retaliating against an inmate for his/her exercise of a
constitutional right" such as his or her right to file a grievance
with state officials or a lawsuit regarding prison conditions.

Smith v. Messinger, 293 F.3d 641, 653-654 (3d Cir. 2002)  The
Court of Appeals in Smith stated as follows:

> Smith argues that "there is more" to his claim. However,
> he must clear two hurdles to overcome the district
> court's reliance on Freeman. First, it is now clear
> that the sanction Smith challenges (seven months
> disciplinary confinement) does not, on its own, violate
> a protected liberty interest as defined in Sandin.
> Therefore, he can not establish that the defendants'
> conduct denied him substantive due process by
> infringing upon a liberty interest. Second, he was
> afforded a hearing and therefore had the opportunity
> to confront and challenge the allegedly perjured
> testimony offered in support of the misconduct reports.

293 F.3d at 654.

In the present case the only animus alleged by West is
that Correctional Officer Shade retaliated because he refused to
accept a cellmate.  However, West has no constitutional right to a
single cell or to refuse a cellmate. See Rhodes v. Chapman, 452
U.S. 337 (1981); Carpenter v. Kloptoski, 2011 WL 995967, *9
(M.D.Pa. Mar. 17, 2011); Hunter v. Bledsoe, 2010 WL 3154963, *2
(M.D.Pa. Aug. 9, 2010); Hughes v. Miskell, 2010 WL 8499990, *9-10
(M.D.Pa. Dec. 28, 2010); Hodges v. Wilson, 2008 WL 5049742, *2
(W.D.Pa.) aff'd, 341 Fed. Appx. 846 (3d Cir. Aug. 11, 2009);
Waters v. Flores, 2012 WL 484530, *3 (E.D. California Feb. 14,
2013); Austin v. Chesney, 1995 WL 498720, *2-3 (E.D. Pa. 1995).
Consequently, because there is not constitutional right to a
single cell and the summary judgment record reveals that West
received all of the requisite due process requirements throughout

30

the disciplinary proceedings, no jury could reasonably conclude that West's constitutional rights were violated because of Correctional Officer Shade filing an alleged false misconduct report.  Consequently, summary judgment will be entered in favor of Correctional Officer Shade and against West.

West alleges that staff negligently ordered him to enter a cell occupied by another inmate while he was on a hunger strike in violation of BOP policy, that he was then kicked by the inmate occupying the cell when the cell door was opened, and the other inmate was then removed from the cell.  The summary judgment record conclusively demonstrates the falsehood of West's claim that BOP regulations require, without any exceptions, that inmates on hunger strikes be single celled.

West's remaining claim is against the United States under the FTCA.  West claims negligence by the BOP employees who attempted to place him in the cell with an inmate who was also on a hunger strike, because he alleges that the other inmate, just prior to the cell door being opened, stated "he ain't coming in here".

The FTCA provides a remedy in damages for the simple negligence of employees of the United States to protect federal inmates.  United States vs. Muniz, 374 U.S. 150, 150 (1963).  In presenting a FTCA claim, a plaintiff must show:  (1) that a duty was owed to him by a defendant; (2) a negligent breach of said

duty; and (3) that the negligent breach was the proximate cause of the plaintiff's injury/loss.  <u>Mahler v. United States</u>, 196 F. Supp. 362, 364 (W.D. Pa. 1961), aff'd, 306 F.2d 713 (3d Cir.), <u>cert. denied</u>, 371 U.S. 923 (1962).  The FTCA is an explicit waiver of the United States government's sovereign immunity from suit in federal court for the negligent actions of its employees. <u>Ochran v. United States</u>, 117 f.3d 495, 499 (11th Cir. 1997).  However, there are several exceptions to that waiver of immunity. The United States argues that the discretionary function exception of the FTCA precludes West's negligence claim.

In <u>United States v. Gaubert</u>, 499 U.S. 315, 322 (1991) the Supreme Court held that the discretionary function exception protects the conduct of federal employees at all levels of government. Under this exception, a court is to "consider the nature of the conduct and determine whether it involves 'an element of judgment or choice.'" <u>Ochran v. United States</u>, 117 F.3d 495, 499 (11th Cir. 1997)(quoting <u>Gaubert</u>, 499 U.S. at 322).  If the conduct at issue involves the exercise of judgment or choice, the court must decide whether that judgment or choice is grounded in considerations of public policy and in making that determination the court does not focus on the subjective intent of the employee. <u>Ochran</u>, 117 F.3d at 500.  Instead, the court focuses "on the nature of the action taken and on whether they are susceptible to policy analysis." <u>Id.</u> (quoting <u>Gaubert</u>, 4999 U.S.

at 325); see also Mitchell v. United States, 225 F.3d 361, 363-364
(3d Cir. 2000). Furthermore, the fact that actions are taken at an
"operational level" not a "policy level," does not remove the
official's action from the discretionary function exception.
Gaubert, 499 U.S. at 325.

     As set forth above, Gaubert sets forth a two pronged
test to determine whether the discretionary function exception is
applicable. First, a court is to "consider the nature of the
conduct and determine whether it involves 'an element of judgment
or choice.'" Gaubert, 499 U.S. at 322.  If the court determines
the conduct at issue involves an exercise in judgment, the court
must then focus, "on the nature of the actions taken and on
whether they are susceptible to policy analysis" and as stated
above actions taken at the operational level do not remove the
employee's actions from the exception.  Id. at 325.

     Turning to the first prong, it is well-settled that
prison officials are accorded wide ranging deference in their
adoption and enactment of procedures regarding internal security
and safety.  Bell v. Wolfish, 441 U.S. 520, 547 (1979).  The
safety of federal inmates is governed by 18 U.S.C. § 4042.  That
provision requires the BOP to provide for the "protection" and
"safekeeping" of inmates.  Additionally, federal regulations
require the BOP to "control inmate behavior."  28 C.F.R. §
541.10(a).  However, no federal statute, regulation, or policy

33

requires the BOP to take a particular course of action to comply with these requirements. <u>Donaldson v. United States</u>, 281 Fed. Appx. 75, 77 (3d Cir. 2008); <u>see also</u> <u>Rinaldi v. United States</u>, 460 Fed. Appx. 80, 81 (3d Cir. Feb. 3, 2012)("[T]here is no federal statute, regulation or policy which requires the BOP to take a particular course of action to ensure an inmate's safety from attacks by other inmates.").

In the present case, the BOP had the discretion to place West who was on a hunger strike in a cell with another inmate who was also on a hunger strike.  The summary judgment record establishes this fact and no juror could reasonably conclude otherwise.  Consequently, the first prong of the <u>Gaubert</u> test is met.

It appears that West is arguing that the BOP employees were negligent in the manner in which he was placed in the cell after they were informed that the inmate occupying the cell stated he did not want West as a cellmate.  While it can be argued that BOP staff should have interpreted the inmate's statement as a threat and should have first secured the inmate inside the cell before placing West in the cell, the exercise of discretion in such matters is precisely what the discretionary function preserves.  Federal courts are to afford "wide-ranging deference [to the BOP] in implementing and executing their policies because their discretion is needed to preserve internal discipline and

maintain institution security." <u>Donaldson</u>, 281 Fed. Appx. at 77;
Rinaldi, 460 Fed. Appx. at 82; <u>Bell</u>, 441 U.S. at 547-548.

The Court of Appeals for the Ninth Circuit has held that
the BOP has the discretion to determine how to respond to a threat
from one inmate to harm another inmate and "that discretion is the
kind protected by the discretionary-function exception." <u>Alfrey
v. United States</u>, 276 F.3d 557, 565 (9th Cir. 2002); <u>see</u> <u>also</u> <u>Pratt
v. United States</u>, Civil No. 1:11-CV-1337, 2012 WL 4103912, *2-3
(M.D.Pa. Sept. 18, 2012)(holding that the discretionary function
exception bars FTCA claim for injuries by fellow inmate).  Because
the discretionary function exception applies, the United States is
entitled to an entry of summary judgment in its favor.

Furthermore, it is well-settled that a federal district
court in considering a FTCA action must apply the law of the
state, in this case Pennsylvania, in which the alleged tortious
conduct occurred.  28 U.S.C. § 1346(b) (1996); <u>Toole v. United
States</u>, 588 F.2d 403, 406 (3d Cir. 1978); <u>O'Neal v. Department of
Army</u>, 852 F. Supp. 327, 334-35 (M.D. Pa. 1994); <u>Turner v. Miller</u>,
679 F. Supp. 441, 443 (M.D. Pa. 1987).  However, in cases
involving federal prisoners, this court has recognized that the
government's duty of care is one of ordinary diligence.  <u>See</u> 18
U.S.C. § 4042; <u>Turner</u>, 679 F. Supp. at 443.  The applicable law
with respect to the burden and quantum of proof under the FTCA
remains that of the state in which the alleged tortious conduct

occurred.  Hosic v. United States, 682 F. Supp. 23, 25 (M.D. Pa. 1987).

Under Pennsylvania law a plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence.  Baum v. United States, 541 F. Supp. 1349, 1351 (M.D. Pa. 1982).  Furthermore, Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury.  Hamil v. Bashline, 481 Pa. 256, 265, 392 A.2d 1280, 1284 (1978).

There is no evidence in the record that the inmate in the cell threatened to kick West if the BOP employees attempted to place him in the cell. Likewise, there is no indication that the inmate had previously assaulted West or any other inmate under similar circumstances and that the BOP employees were aware of that prior assault.  Consequently, the court concludes that there is no evidence in the summary judgment record from which a jury could reasonably conclude that BOP employees breached a duty care or that breach was a proximate cause of West's de minimus physical injury.[15]

_____

15.  The waiver of sovereign immunity by the United States is subject to several requirements.  One requirement relevant to a suit by a prison inmate to recover damages for emotional harm is that there must be a showing of prior physical injury. 28 U.S.C. § 1346(b)(2). The "physical injury" requirement is only satisfied by a showing of "less-than-significant-but-more-than-de minimis physical injury[.] Mitchell v. Horn, 318 F.3d 523, 524 (3d Cir.
(continued...)

An appropriate order will be entered.

-------------------

15.   (...continued)
2002).